UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NOE J. SIUTA,

              Plaintiff,                          Case No. 05-72858

vs.

                                       HONORABLE DENISE PAGE HOOD
                                       HONORABLE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

_____/

**REPORT AND RECOMMENDATION**

**I.      BACKGROUND**

Noe J. Siuta brought this action under 42 U.S.C. § 405(g) in order to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). For the following reasons, it is recommended that Defendant's motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment be GRANTED IN PART and the case remanded for further administrative proceedings consistent with this Report.

**A.      PROCEDURAL HISTORY**

Plaintiff applied for DIB on December 3, 2002, alleging he was disabled on September 30, 2001. (R. 38). On April 23, 2003, Plaintiff's application was initially denied. (R. 29). A hearing was held before Administrative Law Judge ("ALJ") Anthony B. Roshak on October 6, 2004. (R. 118). ALJ Roshak issued a decision on April 25, 2005, finding Plaintiff not to be entitled to a period of disability. (R. 9, 17). On May 27, 2005, the Appeals Council denied

Plaintiff's request for review of the ALJ's decision.  (R. 3).

    **B.**    BACKGROUND FACTS

        **1.**    PLAINTIFF'S HEARING TESTIMONY

       On October 6, 2004, Plaintiff testified before ALJ Roshak.  He was represented at the hearing by counsel.[1]  (R. 118).  Plaintiff was born on January 1, 1965 and was 39 at the time of the hearing.  (R. 121).  Plaintiff stated he was 5' 6", and weighed 180, and is right-handed.

       Plaintiff has never been married, has no children and lives with his brother.  (R. 121).  Plaintiff lives in a single story house, with a basement.  (R. 122).  He attended school until the 8th grade, with no other subsequent vocational or special training.  He has no present source of income, does not receive food stamps and is supported by his brother.  (R. 129).

       Plaintiff normally gets up at 9:00 am and goes to sleep at 11:00 pm.  (R. 123, 124).  Plaintiff does "a little bit" of housework but no yard or garden work.  (R. 122–123).  He attends church services "once a month," goes grocery shopping with his brother and visits with friends and relatives.  (R. 122, 123).  He is not involved in any sporting activity nor does he have any hobbies.  (R. 123).  He does not go to the movies very often; the last time he went was "a couple of months ago."  He stated that he watches television about a half-hour per day, but later stated that he "watch[es] TV all day."  (R. 122–123, 124).  When questioned by the ALJ about how many hours this would entail, Plaintiff answered: "I watch TV off and on at night."  (R. 124).  Plaintiff does not smoke, drink alcoholic beverages or take illegal drugs.

---

    [1] ALJ Roshak sent Plaintiff a letter on May 5, 2003, and a second "Final Reminder" on November 24, 2003 informing him of his right to be represented at the hearing.  (R. 27, 26).  Plaintiff filed a form notifying the Commissioner of the Appointment of Counsel, Mr. Philip R. Fabrizio, on December 5, 2003.  (R. 24).  Mr. Fabrizio represented Plaintiff at the hearing, (R. 118), but is not Plaintiff's current counsel.

Plaintiff is able to take care of his personal needs, such as washing, bathing and dressing. (R. 124). Plaintiff can sit "for a while," and when further questioned, said he could sit for "about a couple of hours." (R. 124–125). He stated that can stand for a couple of hours.[2] (R. 125). He can walk "about a mile," can manipulate his arms and fingers (he is able to pick coins off a table and button his buttons), can lift a maximum of 25 pounds and carry a maximum of 30 pounds. (R. 125–126). Plaintiff has no difficulties bending, pushing or pulling. (R. 126).

Plaintiff has difficulty understanding and remembering detailed instructions. (R. 126). He also claimed he has problems maintaining attention and concentrating. In response to a question from his attorney, Plaintiff said he knows how to tell time "a little bit." (R. 130). Plaintiff incorrectly identified the current date as October 9, 2004.[3] (R. 131). Asked by his attorney if "his brother helped him out in most things", including "answering your phone", Plaintiff answered "yes" and that his brother "mostly answers the phone." (R. 132). When Plaintiff is home by himself he will answer the phone.

Plaintiff has trouble with his hearing, testifying that he wears a hearing aid in his left ear. (R. 126–127). When asked whether he had "trouble with" or was "allergic to dust, fumes, or

---

[2]
| Q. | How long can you stand? |
|---|---|
| A. | I don't know. |
| Q. | Well, give me a guess. |
| A. | A couple of minutes. |
| Q. | Just a couple of— |
| A. | A couple of hours. |
| Q. | A couple—well, which is it? A couple minutes? A couple hours? |
| A. | A couple hours. |

Plaintiff's hearing testimony, R. 125.

[3] The date of the hearing being October 6, 2004.

3

chemicals," Plaintiff responded affirmatively.  (R. 127).  Plaintiff noted that he had trouble

reaching up or out.  He did not have any problems handling, seizing, holding or grasping things;

stooping; kneeling; bending; crouching or squatting; or crawling.  Plaintiff said he had "a little

bit" of trouble with climbing.  Plaintiff drives a Jeep Cherokee and has a valid driver's licence,

with no restrictions.  (R. 128).  He has not recently taken any long trips.

When asked by ALJ Roshak why he felt he was disabled and unable to work, Plaintiff

replied, "I guess they say I'm too slow."  (R. 129).  When asked by the ALJ why he was too

slow, Plaintiff responded, "That's what they tell me. I don't know, sir."  He has no other

physical, mental, or emotional problems.  The only medications Plaintiff takes are "for the

heartburn and stuff."[4]  (R. 130).  He is not seeing any other doctor than Dr. Barry Myers, who is

treating him for heartburn.  (R. 130, 90).

When he worked, Plaintiff stated he did not have difficulty getting along with co-workers

or supervisors.  (R. 128).  Plaintiff has worked as a janitor and most recently as a machine

operator.  (R. 128–129).  He stopped working on September 30, 2001, because the plant closed.

(R. 129).  In response to questions from his attorney, Plaintiff stated that he had not worked since

then, but then agreed with his attorney that he had "work[ed] for a company a couple of months

ago."  (R. 131).  He had done "line work" for "four months" and been laid off  "because I was

too slow."  (Id.)

At the line work job, he "[hung] parts on a rack."  (R. 132).  Plaintiff found the job

_____

[4] In a 'Claimant's Medications' form he filled out as part of his disability application, Plaintiff
only listed Aciphex (rabeprazole sodium), a heartburn medication he takes once per day.  (R. 89).

4

through "Express [Personnel Services]" (a job-placement program).[5]  (R. 134, *see* R. 91).

Plaintiff thought he "did pretty well" at that job.  "[O]ne of the supervisors" told him he had a

production quota, which he couldn't meet: "That's what they told me. I don't know. To me I

don't think I was that slow."  (R. 133).   Asked by his attorney if he had held any jobs since then,

Plaintiff replied: "I put an application in [INAUDIBLE] and they told me I was too slow."  (R.

131–132).  His job-placement program "couldn't find any place else because they were–they

looked all over and they just couldn't find anywhere else for me to work."  (R. 134).  When

asked by the ALJ if he had tried Michigan Rehab, Plaintiff stated he had last tried it "a couple of

months ago."  (R. 134–135).

## 2.    MEDICAL EVIDENCE

On April 15, 2003, Plaintiff was evaluated by Terry Rudolph, Ph.D., LP, for the

Michigan Disability Determination Service.  (R. 111–115).  Plaintiff described his disability as

"a problem hearing" and "a low education."  (R. 111).  In terms of social functioning, Plaintiff

stated he got along with his brother "pretty good, pretty well," and was active with friends.  His

interests were limited to "watching TV, listening to the radio."  (R. 112).  The day before the

examination, Plaintiff stated he had cleaned the house, did the dishes, dusted, mopped, and did

the laundry.

Dr. Rudolph stated, in his 'General Observations', that Plaintiff "had the appearance of a

person who might have developmental disabilities."  (R. 112).  He "displayed bi-lateral hearing

aids."  His hygiene and overall dress and grooming seemed to be "good"; he was "polite and

---

[5] Plaintiff listed dates of employment by Express Personnel as being between January 16, 2004, and June 8, 2004.

5

cooperative."  Dr. Rudolph observed that Plaintiff  "seemed to be readily able to receive and respond to conversational tones in an office setting."  He noted Plaintiff was not "spontaneous or expansive" with his responses, with an "evident . . . limited fund of information and poorly developed vocabulary."  Plaintiff's "emotional reaction was flat and bland" with little "range of affect."  Plaintiff did "display some problems with articulation."  (Id.).

As part of the testing of his mental capacity, Dr. Rudolph gave Plaintiff a series of orientation, memory, information, calculation, abstract thinking, similarities/differences and judgment tests.  (see R. 113).  Dr. Rudolph administered the Wechler Adult Intelligence Scale–III (WAIS–III) to assess Plaintiff's I.Q.[6]  (R. 114).  Plaintiff's test results were Verbal IQ: 62 (90% Confidence Interval (CI): 59–67; Percentile: 1%); Performance IQ: 78 (90% CI: 74–85; Percentile: 7%); and Full Scale IQ: 66 (90% CI 63–70; Percentile: 1%).  Dr. Rudolph summarized his findings, stating that

> . . . it does appear [Plaintiff] has language processing difficulties . . . [H]e is very concrete and literal in his reasoning.  He is very poor at computation skills. Today's testing indicates that he is operating in the Mildly Mentally Impaired Range of Cognitive Functioning.  There was a significant difference between his [Verbal] IQ of 62 and his [Performance] IQ of 78, which would seem to support the presence of language processing problems.  However, it is felt that his [Full Scale] IQ of 66 probably best summarizes his overall level of functioning.  He displayed a relative strength in terms of his attention to visual detail and his abstract non-verbal reasoning ability.  The remainder of his subtest scores were in the mildly to moderately impaired range.

(Id.)

––––––––––––––––––––

[6] Assessing Plaintiff's behavior during the test, Dr. Rudolph wrote that:

"[Plaintiff] appeared to put forth a reasonable effort during testing.  He readily understood instructions and questions did not have to be repeated to him, although he did repeat the questions aloud as if to confirm what he had heard.  He was diligent to tasks and did not give up easily.  It is felt that today's testing is a reasonable and valid estimation of his current level of cognitive functioning."

(R. 114)

Finally, Dr. Rudolph gave Plaintiff a diagnosis on the five-axis standardized Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") scale, diagnosing, on Axis I, Clinical Syndromes: None; Axis II, Developmental and Personality Disorders: Mild Mental Retardation; Axis III, Physical Conditions (that exacerbate I and II): Bi-lateral hearing loss; Axis IV, Stressors in Daily Life: "Problems in employment, primary support group with physical health"; and Axis V, Current GAF (Global Assessment of Functioning) Score: 55.[7]  (R. 115).

On April 18, 2003, Robert Newhouse, M.D., completed a Psychiatric Review Technique Form ("PRTF").  (R. 96–107).  Reviewing the record up to that date, Dr. Newhouse found Plaintiff did not meet or equal a Listed Impairment, using the category 'organic mental disorder', 20 C.F.R. Part 404, App. 1, §12.02,  rather than 'mental retardation,' 20 C.F.R. Part 404, App. 1, § 12.05.  (R. 96).  In rejecting Dr. Rudolph's diagnosis, Dr. Newhouse stated:

> Diagnosis at MSE with WAISIII was mental retardation, however has been able to work in machine shop, is able to drive and seems fairly independent in ADL. This along with the fact we have no IQ prior to [age] 22, it would seem more appropriate per program guidelines to use the diagnosis of BIF.

(R. 97; punctuation added).

Under the "B" criteria of the PRTF, the Rating of Functional Limitations, Dr. Newhouse

---

[7] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed, 1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32.  For example, a GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood"; a GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.*  Plaintiff's GAF score, within 51 to 60, signals "the existence of moderate difficulty in social or occupational functioning."  *Id.*

used the Listing 12.02 diagnosis and found "mild" restriction of Plaintiff's activities of daily

living and difficulties in maintaining social functioning; "moderate" difficulties in maintaining

concentration, persistence or pace; and no episodes of decompensation. (R. 106). He found no

evidence that Plaintiff met the more extreme limitations of the "C" criteria for an organic mental

impairment. (R. 107).

In the Mental Residual Functional Capacity Assessment, also completed on April 18,

2003, Dr. Newhouse summarized Plaintiff's record, stating that his abilities to understand and

follow detailed instructions, carry out detailed instructions, maintain attention and concentration

for extended periods, and work in coordination with or in proximity to others without being

distracted by them were "moderately limited." (R. 108–109). Dr. Newhouse found Plaintiff to be

"not significantly limited" in the rest of the items on the Assessment form. (R. 108–110). No

evidence of limitation was seen for the ability to get along with peers without distracting them or

exhibiting behavioral extremes, or be socially appropriate and adhere to basic standards of

neatness and cleanliness. (R. 109). Dr. Newhouse elaborated his conclusion, stating that Plaintiff

was "intellectually chall[e]nged, may have trouble with complex detailed tasks, ADL are

consist[e]nt with age and I.Q., [and] retains the ability to do simple tasks on a sustained basis."

(R. 110, punctuation added).

On July 10, 2003, Plaintiff's intellectual functioning was evaluated by James T. Hansen,

Ph.D. (R. 116–117). Plaintiff was accompanied by his brother: Dr. Hansen noted that Plaintiff

could not provide historical information, "so his brother was interviewed." (R. 116). Plaintiff's

affect was "flat," barely speaking and only giving "one or two word responses." (Id.) Plaintiff

was otherwise cooperative, thus Dr. Hansen felt "the results of this evaluation can be considered

8

an accurate representation of Mr. Siuta's intellectual functioning."  (Id.)

After the interview was completed, Plaintiff's brother left the room, and a WAIS-III test was given to Plaintiff.  (R. 116).  Plaintiff's test results were Verbal IQ: 61 (95% CI: 57–67; Percentile: 0.5%); Performance IQ: 91 (95% CI: 85–98; Percentile: 27%); and Full Scale IQ: 66 (95% CI 68–77; Percentile: 3%).  (R. 117).  Dr. Hansen found a "discrepancy" between the verbal and performance IQ's, indicating Plaintiff "has far greater ability at concrete/motor tasks than at verbal/abstract tasks."  He found Plaintiff had a "relative strength in the area of visually discriminating essential from non-essential details."  Dr. Hansen noted no similar relative weaknesses.  He concluded that Plaintiff's "intellectual functioning is in the extremely low to borderline range."  (Id.)

### 3.     VOCATIONAL EXPERT'S TESTIMONY

When asked by ALJ Roshak to give full credibility to the exertional limitations in the record and Plaintiff's hearing testimony, i.e., his "limited ability to sit, stand, walk, lift, carry, push or pull," as well as his age and education, Vocational Expert ("VE") Raymond Dulecki testified that the Plaintiff could not do any of his past work.  (R. 136).  VE Dulecki explained that the Plaintiff's testimony that he could lift only 25 pounds (see R. 125) was below the minimum needed for his past two jobs.  VE Dulecki assumed both were "medium and unskilled."  (R. 135, 136–137). In making this assumption, VE Dulecki noted that the "two" vocational reports in the record differed: one listed Plaintiff's machine operator job as "light" and the janitor job as "medium", and the other machine operator "medium" and janitor "light."  (R. 136–137; see R. 58–59, 70–71; alleged exertional demands of only the machine operator job are listed at R. 49).

VE Dulecki testified that even given light work levels, substantial work existed in

9

Southeast Michigan: 80,000 jobs existed in industrial settings, such as "machine operator, assembler, hand packager"; and 30,000 service-related positions, e.g., "janitorial work, stock work, that sort of thing." (R. 137).  ALJ Roshak added Plaintiff's "physical, mental, postural, manipulative, visual, environmental and functional" non-exertional limitations to his hypothetical. (R. 137).  VE Dulecki testified that

> the issue of being too slow is a severe problem that would prevent any of the jobs. The problems with attention and concentration, problems with detailed instructions, limitations in reaching, the hearing aid, and the issue of clean air are limiting factors.

(Id.)

As required by Social Security Ruling 00-4p, VE Dulecki determined there were no conflicts between his testimony and "information contained in the DOT."

In response to a question from Plaintiff's counsel about whether Plaintiff's alleged inability to tell time was vocationally important, VE Dulecki stated that "as a normal daily life function you should be able to tell time." (R. 138).  VE Dulecki added, in response to further questions from counsel, that counting ability would not be "terribly important in some of the jobs," but would be in the rest. (Id.)  An "ability to follow simple instructions" would be required in any of the listed jobs. (Id.)

### 4.    THE ALJ'S DECISION

In a decision on April 25, 2005, ALJ Roshak found that the Plaintiff met the earning requirements of the Social Security Act as of September 30, 2001, the alleged onset date, through December 31, 2006. (R. 17).  Plaintiff had "not engaged in substantial gainful activity" since the alleged onset date. (R. 13, 17).

ALJ Roshak next found that the record showed Plaintiff had "hearing loss and mild mental

10

retardation," but that these impairments singly or in combination did not did not equal one listed in Appendix 1, No. 4, Subpart P of the Regulations.  (R. 14, 17).  He found that the Plaintiff's "subjective symptomatology and allegations of debility [were] somewhat exaggerated, self-serving, and without any objective probative medical or non-medical support." (R. 14–15, 17).  He found Plaintiff to have the residual functional capacity for "work . . . involving unskilled tasks."  (R. 15, 17).  He found Plaintiff's "past relevant work as a janitor and machine operator" was "unskilled, medium," and thus did not exceed his residual functional capacity limitations.  (R. 16, 17).

Since ALJ Roshak found Plaintiff's impairments did not preclude Plaintiff from "performing his past relevant work," (R. 17), Plaintiff was not disabled as defined in the Social Security Act.  (Id.; *see* 20 C.F.R. 404.1520(e)).

## II.   ANALYSIS

### A.   STANDARDS OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v.*

*Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

Under the Regulations, an individual will be found to be disabled based solely on his medical condition if he has an impairment of the same or equal severity as one in the Listing of Impairments.[8]  20 C.F.R. § 404.1520(d).  When evaluating the severity of mental impairments, 20 C.F.R. § 404.1520a(e)(1) requires the ALJ to consider activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  The ALJ must take into account:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

S.S.R. 85-16.

20 C.F.R. §§404.1520a(c)(1) requires consideration of "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment."  In addition, under §404.1520a(c)(2) the decision maker must consider the extent to which the mental impairment interferes with an "ability to function independently, appropriately, effectively, and on a sustained basis" including "such factors as the

---

[8]

(d) *When your impairment(s) meets or equals a listed impairment in appendix 1*. If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.

20 C.F.R. § 404.1527(d).

12

quality and level of [ ] overall functional performance, any episodic limitations [and] the amount of supervision or assistance [ ] require[d]."

Much of this analysis is done in the PRTF.  Prior to October 2000, the PRTF was completed at the state agency level and a form was completed by the ALJ and attached to the decision. The SSA revised its regulation in September 2000 and modified 20 C.F.R. §404.1520a(e)(2) to no longer require the ALJ to complete and attach a PRTF.  Instead, the ALJ in the decision

> must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §404.1520a(e)(2).

Again, the paragraph (c) referred to in the above subsection lists the functional areas of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c).

B.    FACTUAL ANALYSIS

Plaintiff makes four arguments in his Motion for Summary Judgment, but for reasons noted below, not all of them should appropriately be considered at this time.  Plaintiff's first argument is that, contrary to ALJ Roshak's findings, his mental impairment meets and/or at least equals Listing12.05B or C.

ALJ Roshak did not specify the Listing(s) he considered in his decision.  Indeed, ALJ Roshak did not comply with the requirements of 20 C.F.R. §404.1520a(e)(2) to incorporate in his decision "pertinent findings and conclusions based on the [PRTF]."  While he summarily

13

concludes Plaintiff does not meet the Listing of Impairments, we are only left to guess why or under what Listing Plaintiff was found wanting.  The decision does trace the results of Plaintiff's IQ tests,  which are a significant, material part of the medical evidence, but does not then discuss what functional limitations were considered by the ALJ in reaching a conclusion about the severity of Plaintiff's mental impairments.

    While in many ways this is not a sympathetic case, given Plaintiff's substantial work history and often bizarre responses at his hearing, there was no exploration of  whether he received special accommodations in his past work that are not generally available.  One might also question whether his odd response patterns (*see, e.g.*, footnote 2 *supra*) were a contrivance, undercutting credibility, or a legitimate product of the confusion of a person with borderline intelligence.

    While "very pleasant and cooperative," Plaintiff had hearing and understanding problems in his initial interview before the state agency representative that required his brother's assistance; indeed, his brother seems to be a large helping force in Plaintiff's life. (R. 45–46).  While Plaintiff noted on his Disability Report that his problems were "no education" and inability to find work, (R. 48), his IQ tests in April and July 2003—deemed to be valid by their respective administrators—yielded Full Scale IQ scores of 66 on both tests, and verbal IQ scores as low as 61 and 62.  The latter (being the lowest) would be the ones used under the Listings.[9]

--------

[9]

    . . . In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.

20 C.F.R. Part 404, App. 1, 12.00D(6)(c).

At Plaintiff's first IQ Test, Dr. Rudolph suspected that Plaintiff had developmental disabilities, and his diagnosis was Mild Mental Retardation.  (R. 112, 115).  At the second IQ test, Dr. Hanson noted that Plaintiff could not provide meaningful  historical information, which had to be given by his brother.  (R. 116).  After testing Plaintiff, Dr. Hanson concluded that his "intellectual functioning is in the extremely low to borderline range."  (R. 117).   Again both testers had no reason to question the validity of their IQ tests, and the identical Full Scale IQ scores of 66 and the nearly identical 61 and 62 verbal IQ scores would reinforce and not distract from their reliability.

Thus, while this case would appear to be a claim under Listing 12.05[10] for Mental Retardation, it was derailed from that Listing and initially denied by the state DDS on April 21, 2003,  (after the first but not second IQ test in the record—both were consistent with each other) based on an "Organic Mental Disorder (Chronic Brain Syndrome)."  (R. 28).  This diagnosis was taken from a PRTF by non-examining state agency consultant Dr. Robert Newhouse, M.D., completed on April 18, 2003.  (R. 96–107).  Dr. Newhouse's PRTF found Plaintiff did not meet or equal a Listed Impairment.  (Id.)  He acknowledged that the evaluator's diagnosis of Plaintiff

---

[10] Under Listing 12.05B–D, claimants qualify for DIB if they have:

B.  A valid verbal, performance, or full scale IQ of 59 or less; OR
C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR
D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
      1. Marked restriction of activities of daily living; or
      2. Marked difficulties in maintaining social functioning; or
      3. Marked difficulties in maintaining concentration, persistence, or pace; or
      4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, App. 1, 12.05B–D.

was Mental Retardation (Listing 12.05) yet he changed his diagnosis to Organic Mental Disorder

( Listing 12.02) because Plaintiff

> has been able to work in machine shop, is able to drive and seems fairly
> independent in ADL. This along with the fact we have no IQ prior to [age] 22, it
> would seem more appropriate per program guidelines to use the diagnosis of BIF.

(R. 97; punctuation added).

Under 20 C.F.R. § 404.1527(f)(1), state agency medical and psychological consultants

make factual findings determining whether the claimant is disabled.[11]  While these decisions are

not binding on the ALJ, who makes a *de novo* determination if a hearing is sought by the

claimant, their opinions are nonetheless still treated as evidence, often significant evidence,

before the ALJ and Appeals Council under 20 C.F.R. § 404.1527(f)(2) and (3).[12]  Yet, it is not Dr.

---

[11]

At the initial and reconsideration steps in the administrative review process, except in disability hearings, State agency medical and psychological consultants are members of the teams that make the determinations of disability.

A State agency medical or psychological consultant will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity. These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527(f)(1)

[12]

(2) Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law. They will consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and medical experts as follows:

> (i) Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.

16

Newhouse's opinion that is before this Court for review. Had it been, Dr. Newhouse's reference to Plaintiff's prior work (R. 69–71) and daily activities (R. 65–68, 77–86) would be significant evidence to consider, although his reference to Plaintiff having no I.Q. tests before the age of 22 would not, given the fact that courts have presumed valid I.Q. tests as being constant over time absent some incident suggesting a change.[13]

_____

> Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether you are disabled. See §404.1512(b)(6).
>
> (ii) When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician or psychologist, the administrative law judge will evaluate the findings using relevant factors in paragraphs (a) through (e) of this section, such as the physician's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of the opinions. Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.
>
> (iii) Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart. When administrative law judges consider these opinions, they will evaluate them using the rules in paragraphs (a) through (e) of this section.

(3) When the Appeals Council makes a decision, it will follow the same rules for considering opinion evidence as administrative law judges follow.

20 C.F.R. § 404.1527(f)(2)–(3)

[13]   "[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning." *Maresh v. Barnhart,* 431 F.3d 1073, 1075 (8th Cir., 2005) (quoting *Muncy v. Apfel,* 247 F.3d 728, 734 (8th Cir. 2001)); *see also Branham v. Heckler,* 775 F.2d 1271, 1274 (4th Cir. 1985) (absent contrary evidence, an IQ test taken after the insured period correctly reflects claimant's IQ during the insured period); *Guzman v. Bowen,* 801 F.2d 273, 275 (7th Cir. 1986) (claimant had low IQ during onset of disability in 1979 rather than just when first tested in 1982); *Luckey v. Department of Health & Human Servs.,* 890 F.2d 666, 668–669 (4th Cir. 1989) (ALJ may assume claimant's IQ remained relatively constant in absence of evidence showing a change in claimant's intelligence functioning); *see also Sird v. Chater,* 105 F.3d 401, 402 n.4 (8th Cir. 1997); 65 Fed. Reg. 50,753 (2000) (explaining that the regulations "permit us to use judgment, based on *current evidence,* to

Here it is the ALJ's decision under review.  The ALJ does not adopt or incorporate Dr. Newhouse's opinion that this case should be evaluated under Listing 12.02 Organic Mental Disorder.  Indeed, ALJ Roshak's decision does not even mention Dr. Newhouse or his opinion.  He does assert that under 20 C.F.R. § 404.1527 "the medical source opinions of State agency physicians and other medical opinions have been examined and accorded due consideration."  (R. 15).  Whether this case is evaluated under Mental Retardation (Listing 12.05) or Organic Mental Disorder (Listing 12.02), this application clearly does involve a mental impairment.  Thus, under 20 C.F.R. §404.1520a(e)(2), the ALJ must  "incorporate the pertinent findings and conclusions" under the PRTF format in his decision.  Even if the ALJ determines the mental impairment does not meet the Listing of Impairments for an award of benefits at step 3 of the Commissioner's sequence, the ALJ must consider the vocational significant effects of any mental limitations at steps 4 and 5 of that sequence. [14]

Here there was no proper evaluation by ALJ Roshak under the Commissioner's regulation.  20 C.F.R. §404.1520a(e)(2).  In *Wilson v. Commissioner*, 378 F.3d 541, 544–545 (6th

---

infer when the impairment began.") (emphasis added).

[14] SSR 85-16:

Unless the claimant or beneficiary is a widow, widower, surviving divorced spouse or a disabled child under the Supplemental Security Income program, the sequential evaluation process mandated by the regulations does not end with the finding that the impairment, though severe, does not meet or equal an impairment listed in Appendix 1 of the regulations. The process must go on to consider whether the individual can meet the mental demands of past relevant work in spite of the limiting effects of his or her impairment and, if not, whether the person can do other work, consideration his or her remaining mental capacities reflected in terms of the occupational base, age, education, and work experience.  The decisionmaker must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work.

Cir. 2004) where the ALJ failed to comply with 20 C.F.R. § 404.1527(d)(2) and give "good

reasons" for not giving weight to the opinion of a treating physician, the Sixth Circuit

admonished:

> It is an elemental principle of administrative law that agencies are bound to follow
> their own regulations. As the Ninth Circuit well summarized in applying this
> principle:
>> 'The Supreme Court has long recognized that a federal agency is
>> obliged to abide by the regulations it promulgates. *See Vitarelli v.*
>> *Seaton,* 359 U.S. 535, 545, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959);
>> *Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403
>> (1957); *Accardi v. Shaughnessy,* 347 U.S. 260, 267, 74 S.Ct. 499,
>> 98 L.Ed. 681 (1954). An agency's failure to follow its own
>> regulations "tends to cause unjust discrimination and deny adequate
>> notice" and consequently may result in a violation of an individual's
>> constitutional right to due process. Where a prescribed procedure is
>> intended to protect the interests of a party before the agency, "even
>> though generous beyond the requirements that bind such agency,
>> that procedure must be scrupulously observed." *Vitarelli,* 359 U.S.
>> at 547, 79 S.Ct. 968 (Frankfurter, J., concurring); *see also* Note,
>> *Violations by Agencies of Their Own Regulations,* 87 Harv. L.Rev.
>> 629, 630 (1974) (observing that agency violations of regulations
>> promulgated to provide parties with procedural safeguards
>> generally have been invalidated by courts).'
>
> *Sameena, Inc. v. United States Air Force*, 147 F.3d 1148, 1153 (9th Cir.1998)
> (parallel citations and circuit court citations omitted).

20 C.F.R. §404.1520a(e)(2), like § 404.1527(d)(2) involved in the *Wilson* case, is a regulation

"intended to protect the interests of a party before the agency."   Thus, the regulation cannot be

ignored.

Here, while the ALJ did not do a specific analysis at step 3, Plaintiff's counsel in her brief

argues that this Court should do such an analysis and find that Plaintiff is disabled under Listing

12.05 B or C.  In response, the counsel for the Commissioner—referring to Dr. Newhouse's

report and findings and the ALJ's summary assertion that he considered it (albeit not to the point

of mentioning its contents, findings, or its author)—argues that this Court should find that

19

Plaintiff does not meet Listing 12.05 B or C.  While this Court could make the necessary factual

findings and do the required analysis under 20 C.F.R. §404.1520a(e)(2) to determine if Plaintiff is

disabled under Listing 12.02 or Listing 12.05 B or C, this would amount to a *post hoc* judgment

and would undertake a role Congress assigned to the Commissioner and not this Court.

Apparently a similar effort was made by the Commissioner in the *Wilson* case that was soundly

resisted by the Sixth Circuit.  *Wilson*  urges remand in most cases even  where there is sufficient

evidence in the record to uphold the ALJ decision and even when a different outcome on remand

is unlikely:

> '[A] procedural error is not made harmless simply because [the aggrieved party]
> appears to have had little chance of success on the merits anyway.'  *Mazaleski v.*
> *Treusdell,* 562 F.2d 701, 719 n. 41 [(D.C. Cir 1977)].'  To hold otherwise, and to
> recognize substantial evidence as a defense to non-compliance with [the regulation],
> would afford the Commissioner the ability the violate the regulation with impunity
> and render the protections promised therein illusory."

 *Wilson,* at 546.

    Other Courts have noted that the principle of "harmless error" should rarely be used in

Social Security cases, particularly where the court is required to make additional factual findings

that the government asserts are "clearly established" in the administrative record.  *Heston v.*

*Commissioner of Social Sec.,* 245 F.3d 528, 535-36 (6th Cir. 2001),  recognized the concept of

harmless error in Social Secuirty reviews. Yet, *Allen v. Barnhart,* 357 F.3d 1140, 1145 (10th Cir.

2004), urged caution in analyzing whether an error should be considered harmless:

> [W]e have specifically applied [the principle of harmless error] in social security
> disability cases, though not always by name and without settling on a definitive
> characterization of its precise contours and range of application in this somewhat
> unique, nonadversarial setting. For example, this court has held that certain
> technical errors were "minor enough not to undermine confidence in the
> determination of th[e] case," *Gay v. Sullivan,* 986 F.2d 1336, 1341 n. 3 (10th

20

Cir.1993); *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir.1990), and that an "ALJ's conduct, although improper, d[id] not require reversal" because the procedural impropriety involved had not "altered the evidence before the ALJ," *Glass v. Shalala,* 43 F.3d 1392, 1396–97 (10th Cir.1994). For present purposes, one significant thing this heterogeneous group of cases has in common is that in none of them did this court hold an ALJ's failure to make a dispositive finding of fact harmless on the basis that the missing fact was clearly established in the record, which is the only possible basis for invoking the principle in this case.

Two considerations counsel a cautious, if not skeptical, reception to this idea. First, if too liberally embraced, it could obscure the important institutional boundary . . . that courts avoid usurping the administrative tribunal's responsibility to find the facts. Second, to the extent a harmless-error determination rests on legal or evidentiary matters not considered by the ALJ, it risks violating the general rule against post hoc justification of administrative action recognized in *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) and its progeny.

With these caveats, it nevertheless may be appropriate to supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, i.e., where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.[15]

*Fischer-Ross v. Barnhart*, 431 F.3d 729  (10th Cir. 2005), is a case somewhat similar to

the present one where the court ultimately did find the error harmless.  Citing *Clifton v. Chater,*

79 F.3d 1007, 1009 (10th Cir.1996)), it noted:

> But *Clifton* did not categorically reject the application of harmless error analysis in the present context. To be sure, we apply harmless error analysis cautiously in the administrative review setting.  But as we explained in *Allen v. Barnhart,* 357 F.3d 1140, 1145 (10th Cir.2004), harmless error analysis 'nevertheless may be appropriate to supply a missing dispositive finding . . . where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.'

---

[15] See also *Neal ex rel. Walker v. Barnhart* , 405 F.3d 685, 689 (8th Cir. 2005) ("Harmless error analysis may be appropriate to supply a missing dispositive finding in a social security disability proceeding, where, based on material the ALJ considered, the court can confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.")

In *Fischer-Ross*, as in the present case, the ALJ failed to provide more than summary conclusion that Social Security disability claimant did not meet the criteria of any listed impairment at step 3 of the disability analysis. Yet, in *Fischer-Ross* this error was found to be harmless because the ALJ's findings at other steps of the sequential process provided a proper basis for upholding a step 3 conclusion that a claimant's impairments do not meet or equal any listed impairment.

Yet here, Plaintiff's claim involves a mental impairment that the ALJ claims he properly considered under the Listings, but we cannot verify that. We cannot tell whether it was evaluated under Listing 12.02 or 12.05. This Court might well be able to cobble together various statements in the ALJ Roshak's decision and from the record—such as daily activities and Plaintiff's past work—and write an opinion upholding the ultimate finding of non-disability. But that does not seem an appropriate course in this case.

Plaintiff clearly has a limited intelligence, the record demonstrates significant confusion in his responses, and such a claimant would be particularly handicapped in presenting his best case, even with the assistance of counsel. Nor can it be said on this record that Plaintiff's hearing problems are so insignificant that "no reasonable administrative factfinder, following the correct analysis [under Listing 12.05 C], could have resolved the factual matter in any other way' than to conclude that this hearing problem does not "impos[e] an additional and significant work-related limitation of function." If Plaintiff's hearing problem were found to be a "significant work-related limitation of function" under Listing 12.05 C, that finding in combination with Plaintiff's two sets of unchallenged IQ scores in the range of 60–70, would qualify him for disability benefits at step 3 of the sequential evaluation. This would then end the analysis, and

past relevant work at step 4 would not be considered.

Accordingly, the decision of the Commissioner should be reversed and the case remanded for further administrative proceedings at step 3 of the Commissioner's sequential evaluation, and following steps if needed.  It is also appropriate that these proceedings be before a different ALJ to assure Plaintiff the appearance of a full and fair hearing before a neutral decision maker.

**III.    RECOMMENDATION:**

Accordingly, for the above stated reasons IT IS RECOMMENDED that Defendant's motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment be GRANTED IN PART and the case remanded for further administrative proceedings consistent with this Report.

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

23

Dated: August 4, 2006            s/Steven D. Pepe
Ann Arbor, Michigan         UNITED STATES MAGISTRATE JUDGE


Certificate of Service

I hereby certify that a copy of this Order was served upon the attorneys and/or parties of record by electronic means or United States Mail on August 4, 2006.


                              s/Deadrea Eldridge
                              Courtroom Deputy Clerk

24